UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
HORACE TAYLOR                                          :     **OPINION**
                                                       :
                        Plaintiff,                     :     03 CV 6477 (RLC)
                                                       :
            -against-                                  :
                                                       :
THE CITY OF NEW YORK, P.O. BRENDAN                     :
DONOHUE, Shield No. 30330, individually and            :
in his official capacity, P.O. JAMES SEPULVEDA,        :
Shield No. 25657, individually and in his official     :
capacity, DET. SALVADOR GONZALEZ, Shield No.           :
6563 and "JOHN DOE" #1-10 ("John Doe" being            :
fictitious as the true names are presently unknown),   :
individually and in their official capacities,         :
                                                       :
                        Defendants.                    :
------------------------------------------------------------------X

APPEARANCES

JOHN L. NORRISBERG
225 Broadway, Suite 2700
New York, NY 10007

Attorney for the Plaintiff


MICHAEL A. CARDOZO
100 Church Street, Room 3-190
New York, NY 10007

        JED M. WEISS
        Of Counsel

Attorneys for the Defendants


ROBERT L. CARTER, District Judge

Plaintiff Horace Taylor brings this action against the City of New York, New York Police Department ("NYPD") officers Brendan Donohue ("Donohue") and James Sepulveda (Sepulveda") and police detective Salvador Gonzalez ("Gonzalez" and collectively the "defendants"). Plaintiff alleges claims of false arrest, malicious prosecution, denial of a fair trial and malicious abuse of process, all in violation of 42 U.S.C. § 1983.[1] In addition, plaintiff alleges municipal liability on the part of the City of New York. The defendants now move for summary judgment on all claims.

BACKGROUND

On March 4, 2002, plaintiff was driving in Manhattan near the intersection of West 136th Street and Amsterdam Avenue. Def.'s 56.1 Statement at 1. There were two people in the car with the plaintiff. Id. Robert Barnes ("Barnes") was in the passenger seat and in the back was a man identified by the plaintiff only as "Pete." Deposition of Horace Taylor, dated July 9, 2004 ("Taylor Dep.") at 44. Sepulveda and Donohue, both in plain clothes and in an unmarked police car, initiated a vehicle stop of plaintiff's car at approximately 9:30 p.m. Def.'s 56.1 Statement at 3. There is not much after this point about which the parties agree.

1.  Defendants' Version

According to Donohue and Sepulveda, they stopped the car because plaintiff was not wearing his seatbelt. Def.'s 56.1 Statement at 4–5. Donohue further asserts that plaintiff exhibited nervous behavior after his car was passed by a marked police car. Id. at 5. The parties agree that Sepulveda approached plaintiff's door and asked for his license and registration. Taylor Dep. 47; Mapp/Huntley Hearing Transcript, New York v. Taylor, Indictment No. 1291/02, September 19, 2002 ("Hearing Transcript") at 8. It is also agreed that plaintiff gave

---

[1] The City of New York is not a party to claims of malicious abuse of process or denial of a fair trial. Plaintiff also alleges various parallel infringements on his rights under state common law.

1

Sepulveda his license and the car's rental contract. Id. According to the officers, after the stop plaintiff began moving around in the car and reaching inside his jacket. Hearing Transcript at 9. Sepulveda asked plaintiff to stop making these movements but the plaintiff continued. Id. Sepulveda then asked plaintiff to step out of the vehicle in order to determine whether plaintiff had a weapon. Id. The other occupants remained in the vehicle. Id. at 32. Outside the vehicle, plaintiff continued to make reaching movements. Id. at 9–10.

While attempting to frisk the plaintiff, Sepulveda heard something fall to the ground. Id. at 10. Sepulveda looked down and saw a small brown paper bag. Id. Sepulveda asked Donohue to pick up the bag.[2] Donohue peered inside the paper bag and found a clear plastic bag filled with of cocaine. Hearing Transcript at 10. Sepulveda then arrested plaintiff. Id. The other occupants were then ordered out of the vehicle one at a time and frisked by Donohue. Hearing Transcript at 63. Donohue testified that after being patted down, Pete asked if he was under arrest. Donohue replied that he was not, and "Pete" took a few steps backwards and fled. Id. Donohue did not give chase.

It is agreed that plaintiff was taken to the 26th precinct, where he was surrendered to Gonzalez for processing. Taylor Dep. at 66–67. Gonzalez read plaintiff his Miranda rights and plaintiff initialed a warning form indicating that he understood them. Taylor Dep. at 66–67; Trial Transcript, New York v. Taylor, Indictment No. 1291/02, January 13, 2003 ("Trial Transcript") at 81. Gonzalez also informed plaintiff that he was being charged with a serious felony. Id.

Gonzalez contends that plaintiff was amenable to questioning. Gonzalez testified that although he was aware that the cocaine brought in by Donohue weighed only 42 grams, he told

---

[2] Donohue initially testified that Sepulveda told him that the plaintiff "dropped something to the ground." Hearing Transcript at 46. Subsequently, at trial, Donohue testified that Sepulveda told him that "[plaintiff] threw something to the ground . . ." Trial Transcript at 53.

2

plaintiff that it had been weighed at 52 grams and that plaintiff was facing a twenty–five year to life sentence. Trial Transcript at 83, 90. According to Gonzalez, plaintiff then responded that he had bought 42 grams, not 52 grams. Id. at 83. On the back of the Miranda form, Gonzalez wrote, "[s]tated that he purchased 42 grams = 1 1/2 oz – that he did not buy 52 grams!" Id.; Def.'s 56.1 Statement, Exhibit G. When asked if the statement was an exact quote from plaintiff, Gonzalez said, "[p]retty much, that is what he said, yeah." Deposition of Salvatore Gonzalez, dated October 7, 2004 ("Gonzalez Dep.") at 20. Yet Gonzalez concedes that it was not plaintiff but "one of the other officers that were [sic] present at the precinct told me 42 grams equals one and a half ounces"; thus, some of the allegedly self-incriminating statement was not actually attributable to plaintiff. Gonzalez Dep. at 20. Plaintiff's confession was not confirmed, witnessed or documented in any other way. Gonzalez Dep. at 23–24; Trial Transcript at 91–92.

      2.      Plaintiff's Version

Plaintiff, Barnes and "Pete" were returning from shoe shopping when they were stopped. Taylor Dep. at 44. Plaintiff was driving a rental given to him by the dealership because his car was under repair. Taylor Dep. at 104. Plaintiff insists that he and everyone in his vehicle were wearing their seatbelts at the time of the stop. Id. at 47. Plaintiff contends that he made no nervous movements after the marked police car passed or after being stopped. Taylor Dep. at 47. He stated that after the vehicle stop, all the occupants were ordered out of the car together. Id. at 51. According to plaintiff, he and Barnes were placed in front of the vehicle with their hands on the hood of the vehicle. Taylor Dep. at 52. It is not completely clear from plaintiff's testimony where the third passenger, "Pete", was in relation to plaintiff and Barnes at that time.

Plaintiff contends that after Sepulveda frisked him, Sepulveda began searching the inside of the car. At this point officer Donohue began a frisk of Barnes. Id. 52. While Sepulveda was

3

searching the inside of the car and Donohue was frisking Barnes, "Pete" ran away down the street. Donohue did not give chase but walked in the direction that "Pete" had run. Id. at 99. "Pete" had not been searched. Id. at 52. After engaging in some discussion near the rear of the vehicle, the police officers handcuffed and arrested plaintiff. Id. at 55–57. Plaintiff alleges that he never had drugs in his possession that night. Id. at 58. Plaintiff claims that after he was read his rights at the precinct, he made no statement and refused to answer any questions posed by Gonzalez or any other officers. Id. at 66–68.

Plaintiff was indicted by a grand jury for criminal possession of a controlled substance in the third degree on May 10, 2002.[3] Plaintiff was subsequently tried before a jury, and acquitted of all charges. Certificate of Disposition, Def.'s 56.1 Statement, Exhibit H. In sum, plaintiff spent approximately 11 months incarcerated before, during and immediately after trial. Shortly after being released, plaintiff filed the instant complaint. Complaint, Def.'s 56.1 Statement, Exhibit A.

DISCUSSION

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter but to determine whether there is a genuine issue of material fact remaining for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249; see Rule 56(c), F.R. Civ. P. The court must resolve all ambiguities against the moving party. Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F. 3d 1219, 1223 (2d Cir. 1994). Summary judgment is improper if there is evidence in the record from which a rational jury could find in favor of the non–moving party. Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).

    1.    False Arrest

---

[3] No violation or traffic summons was issued for failure to wear a seatbelt. Taylor Dep. at 101; Trial Transcript at 71.

4

Claims for false arrest and malicious prosecution brought under 42 U.S.C. § 1983 ("§ 1983")[4] resting on the Fourth Amendment right to be free from unreasonable seizures, are "substantially the same" as claims for false arrest or malicious prosecution under state law. Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). Under New York law, a plaintiff claiming false arrest must show: (1) they were, indeed, confined; (2) they were conscious of the confinement; (3) they did not consent; and (4) the confinement was not justified. Jocks, 316 F. 3d at 134 (citing Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 (1975)). The first three elements have been established; the only point at issue in the instant matter is whether there was justification for the plaintiff's arrest. Probable cause to arrest constitutes justification and therefore is "a complete defense to an action for false arrest." Bernard v. United States, 25 F. 3d 98, 102 (2d Cir. 1994).

If the court accepts the plaintiff's version of the facts, plaintiff wore his seatbelt, acted calmly when stopped by the police and possessed no drugs then the arrest was not justified. If, however, credence is given to the officers' recitation of the events, plaintiff was not wearing his seatbelt while driving, was making erratic movements while in his car and had in his possession a bag full of cocaine then the arrest was justified. These outcome determinate questions of credibility are not for the court to decide at this time. "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996). Conversely, "[w]here the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury." Murphy v. Lynn, 118 F.3d 938,

---

[4] Every person who, under color . . .of any state law subjects or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights privileges or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law. 42 U.S.C. § 1983 ("§ 1983").

5

947 (2d Cir.1997). This case is governed by Murphy, as the very existence of probable cause turns on facts in dispute. Defendants' motion for summary judgment on plaintiff's false arrest claim is therefore denied.

        2.        Malicious Prosecution

To prevail on a claim for malicious prosecution a plaintiff must show: (1) the initiation of a prosecution against plaintiff; (2) without probable cause; (3) the proceedings were begun with malice; and (4) the matter terminated in plaintiff's favor. See O'Brien v. Alexander, 101 F.3d. 1479, 1484 (2d Cir. 1996). Despite defendant's assertions to the contrary, clearly the defendants clearly initiated a prosecution against the plaintiff.[5] There is no dispute that it ended in plaintiff's favor. Only the second and third elements are contested here. "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003) (citing Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 (1983)). In the context of a malicious prosecution claim, a grand jury indictment creates the presumption of probable cause. Boyd, 336 F.3d at 76; see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006). However, this presumption may be rebutted by evidence that the police

---

[5] Defendant's reliance on White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988) and Williams v. City of New York, No. 02 Civ. 3693, 2003 U.S. Dist. LEXIS 19078 at *19 (S.D.N.Y. Oct 23, 2003) (Motley, J.) is misplaced. Neither of these cases holds that a police officer is immune from suit for malicious prosecution because of the intervening acts of a grand jury. In fact, these cases actually stand for the proposition that the protection afforded to law enforcement agents by probable cause is not available when the agents have knowingly made false statements to the prosecutor. See White v. Frank, 855 F.3d at 961-2 ("[defendants] contend that the role of both the public prosecutor and the grand jury insulated them from liability for malicious prosecution. We disagree . . . [I]n a subsequent civil action for malicious prosecution [evidence of probable cause] may be rebutted by proof that the defendant misrepresented withheld or falsified evidence"); Williams v. City of New York, U.S. Dist. LEXIS 19078 at *17-19 ("The plaintiff satisfies the first prong, clearly a prosecution was initiated against him . . . [Defendant] is not liable for malicious prosecution . . . unless there is evidence that she mislead the prosecuting attorney").

6

witnesses misrepresented or falsified evidence before a grand jury, or otherwise acted in bad faith.[6]

Defendants claim that plaintiff's allegations of fabrication are unsupported and are therefore ripe for disposal on summary judgment. In doing so, defendants once again the defendants ask the court to make an assessment of credibility. Again, such assessments are not appropriate on motion for summary judgment. Fischl v. Armitage, 128 F3d. 50, 55 (2d Cir. 1997) ("credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.") Although the evidence of falsification is certainly not overwhelming, there are enough inconsistencies in the stories of the police at the scene of the arrest and irregularities in the taking of the plaintiff's statement to preclude summary judgment. Resolving all inconsistencies in the light most favorable to the plaintiff, a reasonable jury could find that the indictment was secured through bad faith or perjury.

Furthermore, once probable cause is in dispute, the element of malice becomes an issue as well. "Lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 131 (2d Cir. 1997). As noted above, the court declines to rule on the credibility of the parties and therefore holds that a material issue of fact exists as to probable cause for the arrest. Thus, malice is at issue as well. Defendants' motion for summary judgment on the malicious prosecution claim is denied.

3.  Right to a Fair Trial

When an officer gives false information about an arrestee to prosecutors he violates the arrestee's right to a fair trial. Ricciuti v. N.Y.C. Transit Authority, 124 F.3d at 130. Denial of the

---

[6] "The intervening acts of a grand jury have never been enough to defeat an otherwise viable malicious prosecution claim . . ." White v. Frank, 855 F.2d 956, 961 (2d Cir. 1988)

7

right to a fair trial is actionable under §1983. "When a police officer creates false information likely to influence a [grand] jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983" Id. This claim can be sustained "even if the officer had probable cause to arrest in the first place." Abreu v. City of New York, No. 04–CV–1721(JBW), 2006 WL 401651, at *6 (E.D.N.Y., Feb. 22, 2006) (Weinstein, J.) (citing Jocks v. Tavernier, 316 F.3d 128, 137 (2d Cir. 2003)).

Plaintiff relies chiefly on his own testimony to support his allegation that the police fabricated evidence during the vehicle stop and subsequent search. However, inconsistencies in the testimony of the police officers also support plaintiff's contentions. The court is troubled by Gonzalez' admission that plaintiff's entire statement cannot be attributed to plaintiff. As noted, Gonzalez he learned some of the information in the statement from another police officer. Although the portions which Gonzalez concedes came from another officer pertain only to numerical conversions, their inclusion raises questions about the entire statement and its attribution to plaintiff. In addition, the statement is not signed by plaintiff or verified in any other way. Gonzalez testified about this statement in front of the grand jury and at plaintiff's suppression hearing. Gonzalez Dep. at 26. There is also the discrepancy in the arresting officer's testimony about how the bag of drugs came to be on the ground. On the basis of these discrepancies, a jury would be entitled to credit plaintiff's testimony and discredit the defendants' version of the events. Having done so, a reasonable jury could find for the plaintiff. Accordingly, defendant's motion for summary judgment on plaintiff's denial of a fair trial claim is denied.

4. Abuse of Process

In New York, an abuse of process claim has three elements: (1) the defendant must have employed regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside legitimate ends of the process. Cook v. Sheldon, 31 F.3d 73, 80 (2d Cir. 1994). Again, state law provides the elements of this §1983 cause of action. Id. Defendants claim that the third element, collateral objective, is not supported by evidence or allegation.

The collateral objective element of an abuse of process claim is separate and distinct and must occur after process is issued. Kalika v. Stern, 911 F. Supp 594, 602 (E.D.N.Y. 1994) (citing PSI Metals v. Firemen's Insurance Co. of Newark, N.J., 839 F.2d 42, 43 (2d Cir.1988)). Plaintiff contends that the defendants arrested him in order to conceal the fact that they had allowed the real owner of the drugs–the rear passenger known simply as "Pete"–to escape from their custody and throw away his bag of drugs as he fled the scene. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 18. Thus, plaintiff does not allege that the process was improperly used after it was issued but only that defendants acted maliciously when they initialized the action. However, "[a] malicious motive alone does not give rise to a cause of action for abuse of process." Curiano v. Suozzi, 63 N.Y. 2d 113, 117, 480 N.Y.S. 2d 466, 468 (1984) (distinguishing between improper motive and improper purpose). The legal process itself was used for what it was intended for, to adjudicate criminal complaints. Even construing the facts in the most favorable light, plaintiff fails to allege the elements of an abuse of process claim. There is therefore no genuine issue for resolution at trial. Summary judgment in favor of the defendants is on the abuse of process claim is granted.

5.  Municipal Liability

Defendants also move for summary judgment on plaintiffs claims of municipal liability. In order to establish the liability of a municipality for the unconstitutional acts of a municipal employee, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy. Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). The fact that an officer, employee or agent of a municipality acted to deprive a plaintiff of a federal right is not in itself a sufficient basis for holding the municipality liable. Sulkowska v. City of New York, 129 F.Supp.2d 274 (S.D.N.Y. 2004) (Schwartz, J.) (finding that municipal liability did rest upon the NYPD policy of closing down bars and restaurants labeled undesirable by local police precincts without due process of law and failure to train police officers regarding relevant laws.) A custom or practice may be established by reference to a single incident if plaintiff is able to show that (i) the policy itself is unconstitutional and (ii) it was the direct cause of the constitutional violation. City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

When seeking to prove a claim for municipal liability grounded on custom or practice, the plaintiff can establish that the custom or practice exists by showing that the municipality, while aware of the questionable custom or practice, exhibited deliberate indifference to it. Vann v. City of New York, 72 F.3d at 1049 ("A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference.") Deliberate indifference can be established in two ways: (i) by showing that the need for more or better

supervision to protect against the constitutional violation was obvious;[7] or (ii) through expert testimony that the practice was contrary to the practice of most police departments and was especially dangerous. Id.

In the instant case, plaintiff claims that the NYPD has "a pattern and practice of stopping and detaining African–Americans based on racial profiling." Pl.'s Mem. of Law in Opp'n. to Def.'s Mot. for Summ. J. at 22. In order to demonstrate an obvious need for better supervision, plaintiff cites two studies: (1) Civilian Complaint Review Board, Street Stop Encounter Report: An Analysis of CCRB Complaints Resulting from the New York Police Department's "Stop & Frisk" Practices (June 2001); and (2) Office of the Attorney General of the State of New York, Civil Rights Bureau, New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York from the Office of the Attorney General (December 1, 1999). These studies support plaintiff's contention that the NYPD may have had a practice of inordinately stopping and searching African–Americans and that this practice was obvious, as it was the subject of numerous complaints.[8]

Such a practice of racial profiling is clearly unconstitutional. "The Constitution prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813 (1996) (holding that the subjective intentions of police officers in making a stop have no bearing on the constitutionality of the stop and subsequent search.) What is not supported by the record, and has not been briefed by either party, is whether, the NYPD made a meaningful attempt to remedy this practice, if it existed.

---

[7] "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Vann v. City of New York 72 F.3d at 1049

[8] The existence of the studies also support the contention that the NYPD was, or should have been, aware of this practice.

Finally, plaintiff must also show a causal connection between the unconstitutional policy and the violation of his rights. City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985). To this end, plaintiff alleges that in line with the NYPD's practice of wrongfully stopping and detaining African–Americans, he was singled out for a pretextual stop, and consequently the arresting and interrogating officers fabricated evidence against him. At this point in the proceedings, the court is not capable of drawing the conclusions necessary to determine the unresolved factual issues outlined above. However, plaintiff has provided more than enough proof to create an issue of fact as to the existence of an unconstitutional practice and on the issue of whether this practice caused him harm. Summary judgment on this claim is denied.

6. Qualified Immunity

Donohue, Sepulveda and Gonzalez assert that they are also entitled to summary judgment on the false arrest claim due to qualified immunity. The doctrine of qualified immunity offers protection for "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McClellan v. Smith, 439 F.3d 137, 147 (2d Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Government actors are protected if it was 'objectively reasonable' for them to have believed that the challenged act was lawful. Lennon v. Miller, 66 F3d 416, 420 (2d Cir. 1995). Officers are entitled to qualified immunity if as a matter of law if, "the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test has been met." McClellan, 439 F.3d at 148.

The right not to be arrested without probable cause is clearly established. See Martinez v.Simonetti, 202 F.3d 625, 634 (2d Cir.2000); Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997);

Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir. 1994). What remains at issue is whether the officers have shown 'arguable probable cause'. Lee v. Sandberg, 136 F. 3d at 103. In McClellan v. Smith, the parties posited two very different renderings of the facts. 439 F.3d 137, 140–144 (2d Cir. 2006). The District Court was able to find objective reasonableness as well as potential for reasonable officers to disagree. Id. at 143–144, 149. However, in doing so the District Court relied too heavily on the defendant's version of the facts. In vacating the grant of summary judgment, the Court of Appeals noted that, "resolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity." McClellan v. Smith, 439 F.3d 137, 149 (2d Cir. 2006) (citing Curry v. City of Syracuse, 316 F.3d 324, 337 (2d Cir. 2003)). The court is here presented with a similar divergence of facts. Upon defendants' version of the facts, arguable probable cause is clear. However, relying on plaintiff's version of the facts, a rational jury could conclude that officers of reasonable competence would not be able to find that probable cause existed. While court may be inclined to trust the statements of one party and not the other, it is not the court's role to make such credibility assessments when determining a motion for summary judgment. Thus, genuine issues of material fact preclude judgment as a matter of law on the existence of qualified immunity.

       7.       Collateral Estoppel

Defendants argue that because plaintiff had a pretrial suppression hearing in which the state court found that defendants had probable cause, the doctrine of collateral estoppel now bars plaintiff from bringing §1983 claims. This argument is meritless. Any appeal of defendant's pretrial hearing outcome would have been premature before the jury's verdict. After acquittal, defendant no longer had the opportunity or incentive to appeal the results of the hearing. He was free, he wanted to "go home and take a nice hot bath." Taylor Dep. at 92. Thus, it cannot be

said that he had a "full and fair" opportunity to litigate the issue. A "full and fair" opportunity is an essential element of collateral estoppel in New York. Weiss v. Manfredi, 83 N.Y. 2d 974, 976, 616 N.Y.S. 2d 325, 326 (1994). Without this element, collateral estoppel does not exist and a defense of collateral estoppel fails.[9]

## CONCLUSION

Defendant's motion for summary judgment is DENIED in part and GRANTED in part as specified above. Because the court has not dismissed all of plaintiff's claims under federal law we need not reach the issue of whether to dismiss his pendant state claims for lack of jurisdiction. The parties are hereby instructed to submit a joint pretrial order within 30 days of the date below.

**IT IS SO ORDERED**

DATED:    New York, New York
          June 19, 2006

                                   _____
                                   **ROBERT L. CARTER**
                                   **U.S.D.J.**

---

[9] The Court of Appeals has held that this is true specifically in cases where an acquitted individual later seeks to assert §1983 claims against police officers despite unfavorable pre-trial hearings. Johnson v. Watkins, 101 F.3d 792, 796 (2d Cir. 1996) ("Collateral estoppel does not apply where appellate review of a suppression determination in a prior proceeding was foreclosed by an acquittal") (internal quotations and citations omitted).

14